## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) Docket no. 2:19-cr-00172-GZS |
| YOLANDA HOWARD, | ) |
| Defendant. | ) |

**ORDER ON MOTION TO SUPPRESS**

Before the Court is Defendant Yolanda Howard's Motion to Suppress (ECF No. 38). The Court held an evidentiary hearing on this Motion on January 28, 2020. Having considered the evidence and arguments before it, the Court DENIES the Motion for the reasons explained herein.

**I.     FACTUAL FINDINGS**

On February 28, 2019, Maine State Trooper Lee Vanadestine worked a patrol on the Maine Turnpike. Near the end of his shift, at approximately 6:50 a.m., Trooper Vanadestine observed a recently crashed vehicle as well as four people around the crash site approximately 100 feet from the right side of the roadway. Vanadestine pulled over to assess the scene and determine whether anyone needed medical attention. When he exited his vehicle, three of the individuals approached him. The fourth, Defendant Yolanda Howard, walked about 50 feet north of Vanadestine along the turnpike. She appeared to be talking on a cellular phone.

Vanadestine questioned the individuals at the crash site and ascertained that one was a bystander who had witnessed the crash and the other three, including Howard, had been in the crashed vehicle. As Vanadestine interviewed the bystander, Howard walked south along the

turnpike shoulder, approaching Vanadestine. He directed her to move away from the roadway, which she did. Trooper Anthony Keim, who was just beginning his parole shift, arrived on the scene soon thereafter.

Together, the troopers conducted license, registration, and identification checks and questioned the individuals who had been riding in the crashed vehicle. They learned that the vehicle's driver lacked vehicle registration and insurance paperwork. They also discovered that the passenger besides Howard had provided an incorrect name and date of birth. The travelers all indicated they were coming from New York, but the troopers observed that they offered vague and inconsistent responses about where specifically they had come from or where they were going.[1] Based on these responses, the troopers concluded that the individuals did not know each other. Trooper Vanadestine also believed that Howard's movements since his arrival were suspicious. As a result, Vanadestine radioed to Maine State Sergeant Thomas Pappas and expressed suspicion that the vehicle or one of its occupants was carrying drugs. Meanwhile, Trooper Keim completed a crash report and continued the investigation. After running a check on the true name and date of birth of the passenger who had initially provided incorrect information, Keim discovered there were two active warrants for that passenger, and he placed the individual under arrest.

Trooper George Loder arrived at approximately 7:30 a.m. He had begun his patrol at 7, had heard on his radio there was a crash involving an individual with an active warrant, and had then driven to the scene to assist. When Loder arrived, Keim asked him if Howard could sit in his vehicle to stay warm. Loder said that was "no problem." Keim asked Howard for her bag, which

---

[1] The Court reviewed all recordings from the troopers' body microphones and cruiser recording equipment that were submitted as evidence. Based on this review, the Court rejects Howard's contention that the troopers' description of the individuals' responses to questioning is inaccurate. The Court finds that the troopers' description is consistent with the recordings.

2

she gave to him, and Loder conducted a limited pat down of her person, which he explained was for safety reasons.[2] At about this time, Sergeant Pappas arrived.

After the pat down, Howard sat in the front passenger seat of Loder's vehicle. Loder placed Howard's bag on the rear passenger-side seat, directly behind her. As he did so, Howard reached into the rear passenger area and dropped her cellular phone. Loder indicated he would retrieve the phone, and Howard stepped out of the vehicle. Pappas asked Howard to move to the front of another vehicle, where she would receive a full pat down from a woman trooper.[3] By this time, it was about 7:35 a.m., and a tow truck had arrived to collect the crashed vehicle.

Then or shortly thereafter, Trooper Jodell Wilkinson arrived with a narcotics detection canine to sniff the crashed vehicle for drugs. First, however, she conducted the pat down of Howard. While she did so, Loder asked Pappas whether he should search Howard's bag. Pappas responded that they needed Howard's consent. Howard was led back to Loder's cruiser, where she stood unrestrained by the front passenger door; Pappas stood near the rear door by her bag. Pappas asked Howard if the items in the back seat were hers. When she indicated they were, he asked whether she would mind if the officers looked through them. The audio recordings from Loder's vehicle dashboard surveillance system indicate that Howard made some ambiguous responses to the initial question, but she eventually responded, "Huh?" after Pappas again asked if she minded the officers searching her items. Pappas then asked, loudly and clearly, "Can we search the items?" Howard made an affirmative reply.[4] Pappas told Howard she could sit in Loder's

---

[2] The troopers credibly testified that it is a routine practice to pat down individuals invited to sit in the unprotected front passenger seat area, as a matter of officer safety.

[3] Pappas testified that the full pat down was needed to ensure that Howard did not carry any weapons under her bulky winter clothing.

[4] Based on the audio recordings from Loder's vehicle dashboard surveillance system, the words Howard used in response to Pappas are not entirely clear. However, the Court finds that they sound closer to the Government's characterization of her reply ("Yes, sir.") than to Howard's ("I guess."). Moreover, both Pappas and Loder credibly

3

vehicle, and she returned to the front passenger seat, turning toward the rear to face Loder as he searched her bag, which was still sitting on the back passenger-side seat.

While Loder searched her bag, Howard was unrestrained, and the front passenger door stood open and unimpeded. During the search, Howard told Loder that she had someone to come pick her up, and he responded, "We will talk about that if we get to that point." Sometime during Loder's search of the bag, Trooper Wilkinson began a drug sniff of the crashed vehicle. The sniff was still occurring when Loder discovered suspected controlled substances in Howard's bag. Based on this, he arrested Howard and transported her to the Maine State Police Barracks.

## II. DISCUSSION

Defendant seeks to suppress evidence flowing from an alleged violation of her Fourth Amendment rights: the search of her bag without her consent, probable cause, or a warrant. The Government contends that neither probable cause nor a warrant were necessary, as the troopers obtained Defendant's voluntary consent to the search. Defendant argues that her consent was involuntary.

Defendant first argues that her consent was involuntary because she provided it after the troopers' investigation at the crash site had been unreasonably prolonged. See Rodriguez v. United States, 575 U.S. 348, 354 (2015) ("Like a *Terry* stop, the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop and attend to related safety concerns." (citations omitted)). She urges that the officers lacked reasonable suspicion to justify either the drug sniff of the crashed vehicle or further investigation of her; therefore, the accident investigation should have ended when the tow

---

testified that Howard said "yes" when Pappas asked whether they could search the items. The Court therefore finds that she replied affirmatively to Pappas's request.

4

truck arrived. On this timeline, her consent to the search occurred during an unlawful prolongation of the accident investigation.

Defendant's argument misses the mark, however, because reasonable articulable suspicion to call for a drug sniff of the crashed vehicle arose as the troopers conducted routine inquiries incident to the accident investigation. See id. at 355 (stating that certain "ordinary inquiries" such as "checking the driver's license . . . and inspecting the automobile's registration and proof of insurance" are incident to the stop and part of its "mission"); United States v. Orth, 873 F.3d 349, 354 (1st Cir. 2017) ("An officer's actions must be justified at their inception, and any subsequent actions are measured by the 'emerging tableau' of circumstances as the stop unfolds."). Through their routine inquiries, the troopers learned that the crashed vehicle's driver lacked vehicle registration or insurance and the vehicle's occupants appeared not to know one another. Though the individuals all indicated they were coming from out of state, they provided inconsistent responses to questions about their travel itinerary.[5] Finally, Defendant at times distanced herself from officers. Any of these factors standing by themselves might not support Trooper Vanadestine's suspicion of criminal drug activity. But considered together in the totality of the circumstances, they give rise to a reasonable articulable suspicion that the car and/or at least one of its occupants carried drugs.[6] See Orth, 873 F.3d at 354 (noting that the reasonableness of an officer's suspicion must be analyzed "in light of the 'totality of the circumstances'"); United States v. Dion, 859 F.3d 114, 125 (1st Cir. 2017) (affirming the reasonable suspicion of a driver's drug

---

[5] Vanadestine testified that, based on his experience, "people traveling from out of state in these circumstances, putting it altogether, oftentimes are carrying drugs." See United States v. Dion, 859 F.3d 114, 124 (1st Cir. 2017) (noting that the reasonable suspicion determination "entails a measurable degree of deference to the perceptions of experienced law enforcement officers").

[6] Defendant points out that, when Vanadestine radioed to Pappas regarding his suspicions, he mentioned Defendant's race more than once. Whatever significance, if any, Vanadestine subjectively attached to Defendant's race, what matters in assessing reasonable suspicion is its *objective* reasonableness in the totality of the circumstances. Here, the various factors other than Howard's race establish the objective reasonableness of Vanadestine's suspicion.

5

activity where the driver was licensed in a different state than the car's plates, exhibited "extreme nervousness," provided a reason for traveling that "didn't add up," and was stopped on a drug-trafficking corridor). This suspicion supported prolonging the accident investigation with a minimally intrusive vehicle drug sniff. United States v. Quinn, 815 F.2d 153, 159 (1st Cir. 1987) (stating that reasonable suspicion of a car containing narcotics justifies a drug sniff of the vehicle).

Concluding that the investigation's expansion was justified leaves open the question whether, as Defendant argues, she was nevertheless coerced into allowing Trooper Loder to search her bag. She contends that she was effectively in custody when Sergeant Pappas sought permission to search her bag and this, in combination with the tactics deployed by Pappas and Loder, rendered her consent involuntary. The Court, however, disagrees. In its view, Defendant was never in custody, nor was she coerced to consent involuntarily.

An investigatory traffic stop rises to the level of custody "where the totality of the circumstances shows that a reasonable person would understand that he was being held to 'the degree associated with a formal arrest.'" United States v. Fornia-Castillo, 408 F.3d 52, 63 (1st Cir. 2005). No reasonable person in Defendant's position would reach this conclusion. During the accident investigation, no officer ever told Defendant she was not free to leave, and she was never physically restrained. When not speaking with officers, she freely talked on her cell phone and moved throughout the crash area. And she was invited, not ordered, to sit in Trooper Loder's cruiser. Defendant notes that she was subject to pat-down searches before entering the cruiser, but, given the context, these searches did not create the impression that Defendant was in custody—as Trooper Loder and Sergeant Pappas testified at the hearing, she was pat down as a routine matter of officer safety because she was wearing bulky clothes and was being allowed to sit entirely unrestrained in the unprotected front passenger seat of a police vehicle. Notably,

6

Defendant remained free to call someone to pick her up from the accident during the time period in question. The totality of the circumstances shows that Defendant was not in custody when Pappas sought her consent to the search.

Nor was Defendant's consent to the search involuntary.[7] As with custody, the voluntariness of consent is analyzed in light of the totality of the circumstances, including the person's "age, education, experience, intelligence, and knowledge of the right to withhold consent" as well as "whether the consenting party was advised of his or her constitutional rights and whether permission to search was obtained by coercive means or under inherently coercive circumstances." United States v. Ramdihall, 859 F.3d 80, 89 (1st Cir. 2017). Defendant argues that her desire to find shelter from the frigid conditions at the time of the search compelled her to consent against her will. But while a reasonable person in Defendant's position might feel *obliged* to give consent before taking a seat in the cruiser, Sergeant Pappas's request would not create the impression that entry into the cruiser was *conditioned* on such consent. Although Defendant was not advised of her constitutional right not to consent, nothing about her age, education, experience, intelligence, or knowledge suggest that the lack of such an advisory, combined with the presence of individuals in uniform and the cold conditions, "actually operated to overbear [her] will" to refuse consent. United States v. Bouchard, 886 F. Supp. 121, 126 (D. Me. 1995) (discussing the standard for evaluating involuntariness where a claim of coercion rests on alleged direct or implied promises and/or improper influence).

Defendant seems to argue that when Trooper Loder deflected Defendant's assertion that she had someone to come pick her up, that somehow vitiated her consent. But Defendant had

---

[7] "[T]he fact of custody alone is never enough to demonstrate coerced consent." United States v. Forbes, 181 F.3d 1, 6 (1st Cir. 1999). Thus, even if Defendant were in custody when Pappas sought permission to search her bag, the question would remain whether Defendant was actually coerced into consenting to the search.

already consented to the search, so Loder's response could only vitiate her consent if it overbore her will to *revoke* that consent. In the totality of the circumstances, there is no reason to think that Loder's response actually overbore her will to do so. The Court therefore concludes that her consent to the search was voluntary.

## III. CONCLUSION

For the foregoing reasons, Defendant's Motion to Suppress (ECF No. 38) is DENIED.

SO ORDERED.

                                               /s/ George Z. Singal
                                               United States District Judge

Dated this 17th day of March, 2020.